The next case for argument is 15-1802, Storer v. Clark. The defense is looking for a defendant who is not a member of the Storer v. Clark family.  Never answered the proper legal enablement inquiry. Can a person of ordinary skill make or use the invention from the disclosures in the patent without undue experimentation? Clark's, our friend's, evidence of undue experimentation was completely untethered to the identics disclosure. To be sure that I understand the issue, we're talking entirely about the provisional specification. Is that right? And whether that specification adequately discloses your neighbor's patent? The one that is oriented, Judge Newman, horizontally, like this, contains on the left side the actual target compound. And it shows not only the target compound was disclosed, but also tells the artisan to look to the materials or the steps on the right-hand column, which are the steps for, as it says, the heading is glycolyzation of the nucleolus. Well, I didn't think that was helpful because I was looking particularly at the two-prime position and the fluoro down, methyl up, at that stage of the proceeding, and I couldn't find it. If you look at the provisional specification and all of the alternatives listed there, you can perhaps find it, although even there I'm not so sure about the steric structure. I didn't see it in the visual aids that you provided. Well, what I will tell you is that if you follow the left-hand column, and I confess that I'm not a chemist, but I think I know enough to be dangerous here. If you follow the left-hand column and follow each of the steps that are listed, including the underlying materials, you will draw this, which you see on my post-it note here, with the fluoro down. You will get to that. So it discloses the end product, and that really has not been a point of great dispute in this case. The board certainly didn't find that it failed to disclose it. But where is it disclosed? You say generically. Yes, absolutely. But if you follow the specific things that are underlined here, you get to the specific 2-methyl-up, 2-fluoro-down nucleoside. Then what you have is a disclosure, and on the cardstock handout that we've handed out to you, there's another side to our visual aid, which is this vertically oriented one, which has two columns. One is our patent and the application, and the other is Clark's enabling conception document. There are only two differences between the disclosures. Clark's is admittedly enabling. They have not argued that their own reference is enabling. We certainly haven't. There are only two differences. One is the presence of this arrow at the top that's boxed in in red and highlighted in yellow, and the other is the explicit reference to DAST, the fluorination reagent. Those were found by the board, I believe, page 23, to be well within the ordinary skill of one in the art. And that brings us back to the failure of the board's decision and ultimately of Clark's arguments. One would expect, in a case like this, where those are the differences between the supposedly enabling junior party and the supposedly non-enabling senior party, that the focus of the board's decision would be on those differences. But that couldn't be the difference, that couldn't be the focus of our friends on the other side or the board, because those were well within the knowledge of one of ordinary skill in the art, and the record is replete and undisputed with regard to that aspect of the case. What is it that the Montpelier people, who tried and failed to do this for a period of years, would have learned, according to you, that they didn't learn from the application? Well, the Montpelier people, and that's really – we're talking about Dr. Griffin and usually one research assistant at a time. What he was doing was completely untethered to the specification. It was as though he was sent out into the woods without a map. He never had the specification. There's no evidence that he did. And the evidence that he didn't is profound because – But wasn't he trying to synthesize a specific compound? Yes, but he was trying to do it without the aid of the specification. So my question is how would the specification have aided him? Well, I'll give you specific examples in response to your question with specific record citations. If you look at page A41-278 and A41-280, you will see that he started with entirely different starting materials. He started with a 2-2'-anhydro-2-iodomethyl derivative. That's nowhere set forth here. When he goes on in the next few months, A41-278 – Was there expert testimony that he would have learned something from the specification that he didn't learn from talking to the inventors? Was there testimony – I mean you can talk all the chemistry you want, but our job is not to be chemists. It's to judge this case based on the record. What does the record show about what he would have learned that he didn't know? Well, the record doesn't show anything that he would have learned. What it does show is that he did have some discussion with the inventors, but there is no testimony – not to my knowledge and not brought up by our friends on the other side – suggesting that the inventors gave him this path. And in fact, if the inventors gave him this path, then there is no rational explanation for him to have started in an entirely different direction and taking entirely different routes of synthesis. And that ultimately brings up the reason why the Griffin evidence is not relevant here. And I want to direct the court's attention to its prior decision in the Johns Hopkins case, which is cited in both parties' briefs. In Johns Hopkins, one of the questions at issue was whether the summary judgment – district court case in that one – of enablement was proper. And there was a claim made on appeal that an expert's testing program had shown failures. This is what the court said, and if you'll indulge me with two sentences from the decision. A party who wishes to prove that the claims of a patent are not enabled by means of a failed attempt to make the disclosed invention must show that the patent's disclosure was followed. Because Sutherland, the expert in that case, deviated from the teachings of the patent in his failed attempts to make the claimed antibodies, his testimony is insufficient to disprove enablement as a matter of law. Well, let's assume that the synthesis of the specific compound, which is now at issue, was not so complex that the basic chemistry couldn't have been found some ways or other, whether in the provisional specification or in the prior art. Here we have a use claim to a specific compound used to treat hepatitis C. That is the issue that must be founded in the provisional, is it not, in order to have the benefit of that date. And that's – there's a big gap there that I haven't been able to fill and that I haven't seen filled in this presentation. Well, I'm sorry, Judge Newman, but I think I'll turn you back to – You want us to talk about enablement of the synthesis, I gather. There's no – nothing in the provisional to say that you must select this particular compound out of the several thousand that are disclosed. And I think this court's decision in Alcon, for example, says that that's not a requirement that there be a teaching that you have to select the specific things. In fact, Alcon says that it's irrelevant whether you even know that you – in the original application that you've actually invented the target. But here, again, I bring the court back to this vertically oriented visual aid, which is the comparison between our disclosure and the Clark disclosure. There's only one – two differences. One is that arrow, and the other is the disclosure of DAST. That wasn't focused on by the court. I'm not sure I understand this comparison. Their disclosure is not an issue. If the provisional, the historic provisional, does not support one way or another the count of the interference, then you may have additional questions as to whether Clark does or does not. But you're asking us to say that because Clark may be viewed as having enabled the specific compound, this then reflects backward to the earlier provisional? I perhaps have put too much weight during this argument on that. That really for us, I think, is further proof. It is what you see in our disclosure in the first instance, which is on the other side of our card stock – handout, excuse me – that demonstrates that the invention was enabled. But Judge Newman, go back to the board's decision here. The board's decision contains a healthy discussion of the undue experimentation requirement of the Wands Factors. And when you – most of it is rehearsal of the party's various arguments. Clark says, Storer responds, that sort of thing. I urge the court to look at the findings and look at the summary of what Clark's arguments were. Clark's arguments didn't have anything to do with the specification. They have everything to do with the Griffin project taking place in Montpellier. And that wasn't tied to the specification. And when you look at the conclusion of the court, it's all based on the Griffin work. It's not tied – Well, that's not quite true because at page 23 they say that the application provides no explicit explanation or guidance as to how to synthesize. Well, to the – there is one sentence at page 23, which, by the way, goes to Wands Factor number two, I think, rather than number one, which is the undue experimentation. This is under the amount or direction of guidance presented. And we admit there is a gap. There is the gap between what is shown, the end product, and the precursor that hasn't been fluorinated. But look at what else the court – what the board says right after that, Judge Dyke. Moreover, we have related supra how the identics team identified such a molecule but failed to – as a high-priority target but failed to synthesize such a compound. Again, it goes back to the same flawed undue experimentation ruling that it made. And if there's any doubt about the board's failure to focus on the specification, you can look – compare pages 8 and pages 35 of the board's decision. At page A8, the board states the rule correctly. It states the rule that we're looking to the specification. When you get to page A35, the board's ultimate conclusion is, we therefore find that Wands Factors 1, 2, 3, 5, and 7 strongly indicate that a person skilled in the art would not arrive at the claimed invention without undue experimentation. There's no reference there whatsoever to the specification. And if you'll note, it's factors 1, 2, 3, 5, and 7 that are called out by the board as being particularly relevant. And 1, 2, and 7 were all infected by the Griffin testing and the failure to arrive at the invention or at least knowingly arrive at the invention. So did the burden of proof to show that the provisional was enabling was on you? I don't think that's right because we were designated as the senior party in the first instance. So I think that the burden was on my friends on the other side. And ultimately our point with regard to remedy here is that it's not just that the board failed to do enough work like in Cutsworth or Gartside, Chief Judge Prost, but it's also that their evidence ultimately failed to engage the specification in the same way that the board's decision failed and that the enablement decision, we should be restored as the senior party. That should be the end of enablement, and the case should be set back for further proceedings on the other issues. And I'll return on rebuttal if the court will have me. Two minutes on rebuttal, please.  Good morning. May it please the court. Let me start first with this visual aid because it got a lot of air time here. Who has the burden of proof to show that the provisional was enabling? We were initially the junior party, and we had the burden to show that they could not claim— The provisional was not enabling. Yes, yes. I think that is correct what counsel said. And we carried that burden as the board explained at length in its decision, which I want to get to. But this visual aid I really want to talk about because I know, Judge Newman, you had some questions about it. This does not reflect the 350 specification really even closely of what the specification actually shows. And in particular, I'd like to talk about—counsel spent a lot of time on what he called the vertically oriented sheet. And what they have done here is what they did in front of the board, and the board saw through it. They have hunted through this 2,000-page patent specification because that's what we're talking about here. You have the appendix up there. Two of the four volumes are this gigantic specification that has something for everybody in there. And what they have done is they have picked one compound from column A-161, which describes the scheme three, and they have juxtaposed it in their visual aid with a formula that is 1,000 pages later in the specification. That formula is one that happens to show fluorine down at the two-prime position. But they did eventually settle, as did you, on the compound with the two-prime fluoromethyl configuration. If your question is, is there disclosure of two-prime methyl fluoro somewhere in the specification among the potential compounds, yes. You can find it there, and this is the question, is it not? Yes, you can find it there, but really the question on this appeal is not just can you see it drawn on a sheet of paper. Can you make it? Is there any teaching in this specification of how someone of skill in the art could actually synthesize that compound? If I understand correctly, it's not so much identifying the compound that's the issue, because the Montpelier people were looking for a specific compound, right? Yes. The question is whether it was the original's enabling to make that specific compound. Precisely. Correct. And here you had a group that, you know, with all due respect, counsel says there's no link between Dr. Garfon and his failures in this specification. Dr. Garfon was working with two of the inventors on this specification who, if they had thought they had come up with an enabling way to make the compound, certainly would have, working with Dr. Garfon, told him. I guess the problem is they didn't actually, the Montpelier people didn't actually have the specification or the provision, right? Well, actually, certainly they had it in the sense that, because again, two of the authors of this specification that IGENIX tries to rely on were working with Dr. Garfon. Dr. Storer is the person to whom Dr. Garfon reported. So in that way they had access to the specification. Absolutely. And indeed, some of the key evidence the board relied on involved Dr. Garfon reporting directly to Dr. Storer, an inventor on this application, saying, I cannot make this thing. I've tried every way we can think of. We've consulted the experts. They made suggestions. That didn't work either. Nothing has worked. And Dr. Storer, does he think for a moment to say to Dr. Garfon, gee, all you've got to do is go to my specification. It's all laid out there. Why don't you try that? No, he never does that. But actually, more than that, I believe I heard… Well, just because a particular scientist went down the wrong path and wasn't able to achieve the synthesis doesn't necessarily say that it's not enabled if, in fact, it was readily enough synthesized when identified that this is the compound that's needed. In the abstract, I agree with you, Your Honor, but there are two very important distinguishing characteristics here. Number one, Dr. Garfon was working, again, with the scientists who are named on this application… To synthesize the specific compound. Trying to synthesize the specific compound. And the board found he tried seven different routes. Ultimately, he did try the route which IDENIX's expert says would have been apparent to somebody of skill in the art from this Scheme 3. So he did ultimately try the very thing that IDENIX says the spec taught, and that failed too. And so it isn't correct. The suggestion was made to you that Garfon's work was completely untethered to the spec. It was not. In fact, one of his seven failures was to try this so-called Scheme A. It's referred to as Scheme A in the briefing. The very thing their expert says is suggested by the spec, and that failed too. And again, to come back to… But Scheme A isn't in the spec. This is my last point, really, on this Visual A, Judge Newman. They reproduced Scheme 3, which is not remotely Scheme A. And they juxtapose it with this formula that comes 1,000 pages later in the specification. And so the board said, I see the argument you're trying to make. I see the argument your expert is trying to make. But the specification shows no synthesis route at all for a 2'-methyl up, fluoro down. Indeed, the board found there's no synthesis route suggested for fluorinating any kind of nucleoside at all, period, in the specification. So you don't have a starting compound. You don't have reagents. You don't have reaction conditions. You don't have a route that's disclosed. So the spec doesn't have any of that. Then you look at the prior art. Well, gee, and there are some cases of this court that say, in a situation where the specification doesn't have it, but if the prior art shows it, and everybody knew it was in the prior art, maybe you have enablement. Here, it's undisputed. The prior art didn't have it either. The board made specific findings on that. This compound had never before been synthesized. A nucleoside with a 2'-methyl up, fluoro down had never before been made until Clark made it. Was the use claim, the claim in interference, was that a count of the interference? Yes. I thought it was curious that here we were arguing about enablement and that the question of priority, when we were talking about priority, didn't seem to involve the testing and the development and verification of the use. Well, I think the reason for that was just practical, Your Honor, and that was you don't even really have to get to the question of how the compound could have been used or might have been used because no one had been able to even make the compound or test the compound for activity. So, I mean, on this record, it's undisputed that Clark, my client, was the first person to make it in 2003, 2002, 2003, and ultimately when his work was published. But apparently a lot of these compounds of this general structure, as it was observed that it had potential value, were synthesized and tested. Not this compound. There were other compounds. Related compounds within the generic structure of the 2,000 listed in the provisional. Yes. There were other compounds. Yes, there were. And, in fact, that really is, I think, an important point. The only thing that IDENIX had ever in store, had ever successfully synthesized, was a 2'-methyl-up-OH down. Okay? That is what they thought conferred activity. That is really what drove their patent application. That, of course, is not at all a 2'-methyl-up-fluoro down. A. B. It's not even a compound. But fluoro is listed among the 2,000, nonetheless. It is listed. It seemed as if a scientist might not have considered that these are paths to be explored. I agree with you in the sense that there are many, many, many thousands of compounds disclosed. A scientist could have looked at that and thought, maybe that's one that I could try or should try. And then the scientist says, he asks himself two questions or herself two questions. Does the specification tell me how I can synthesize it so I can even get the compound and see what it is, what it does? The answer to that is no. The board found resoundingly that was no. And that's actually- We're talking about conception, not reduction to practice, right? Actually, I'm talking about both because I believe in this field, in the chemical art, it's not enough for conception to be able to draw a compound on a piece of paper. You have to either disclose a viable synthetic route to make that compound or, again, to go back to my other exception that's recognized under the case law, if the prior art already told you how to make it, well, then drawing it could be conception. But they don't have either thing here, and the board made multiple findings on both of those issues. So the person of skill looks at these many, many thousands of compounds, could see that one of them is a 2'-methyl up, fluoro down, yes. Specification doesn't tell me how to make it or how to make anything that's fluorinated at all, full stop. I look at the prior art. Does the prior art tell me how? Absolutely not. Also undisputed. There's no synthetic route in the prior art for this compound. And, in fact, no synthetic route in the prior art that could be modified to make this compound. So there we are. Let me- I have two minutes left. I wanted to discuss one other aspect of the argument of counsel, which was the teachings of the specification. So the board, as I already said, found that the spec doesn't disclose any fluorination of any kind. There's a lot of focus on this one compound in Scheme 3, this so-called 2' ketone compound. And Identix says, well, if you take that as a starting point and you make a bunch of subsequent choices, you can ultimately get to something that works. In that respect, two points. The ketone shown in the patent application is never described as being useful for synthesizing the 2'-methyl fluoro. By any route. Indeed, it is used to arrive at something else entirely, which is this methyl up, hydroxy down compound. Not the claimed compound, or the compound of the count, I should say. And, in fact, and this again is undisputed, it has the stereochemistry that is exactly the opposite of what you want, that we later learn from Mr. Clark, works. So it's not only that it's not something that itself could be used, it actually leads affirmatively to a dead end. And so you can look in the specification, at the specification, and you won't find what you need. Last point, unless there are questions. There was a suggestion made that Griffon's failures are not relevant because he's not tied closely enough to the 350 specification and to the route in the specification. I already addressed that. I just want to point out that we cited in our brief a couple of this court's cases, the ALSA case and the ORMCO case, both of which say it is, in fact, highly relevant when the patentee's own efforts at trying to synthesize a disclosed compound fail. That is highly relevant evidence on the enablement. Question. Thank you. Thank you. And you are here to discuss exclusively one issue? That's correct, Your Honor. Good morning. Joe Buse on behalf of the government. The United States intervened solely to address one issue, that is the issue of the constitutionality of several acts of Congress, as interpreted by this court in Biogen. Rather than the threshold of the constitutionality, are you also prepared to discuss Section 146? We are definitely prepared to discuss how phasing out 146 review for newly declared interferences. But what is the government's position? If you read the legislative history of the statute, it doesn't say anything about Section 146, and yet logically it doesn't fit with the change to a first to file. So what is the position of the government on the viability of Section 146? Well, I think the position of the government is that the panel opinion in Biogen definitively settled the question of whether Section 146 review is still available for newly declared interferences, and that the full court having denied en banc the hearing and the Supreme Court having denied cert on this question, that it's a binding decision that applies to this panel. You're saying it's decided and therefore the government takes that position? That's correct, Your Honor. We don't feel the need to take it. And if for some reason you can't say it's decided? Well, we do. I'm not in the habit of questioning binding circuit precedent, so I apologize, Your Honor. I am here only to defend the constitutionality of the statutes as interpreted in Biogen. And if there are no further questions on that simple issue, we believe that our brief lays out the relevant facts and the law, and so we're happy to rest on that brief. I would only emphasize the simple question that is before this court, and that is to decide the question of whether any conceivable set of facts could support a rational basis for the classifications drawn. Under Beach Communications, a Supreme Court case, it is irrelevant whether Congress actually had that rational basis in mind when it enacted the statute. There only must be a conceivable set of facts that would make it rational for Congress to have drawn the lines that it did. Here, we provide at least four reasons why Congress could have rationally devised the lines that Storer now complains of, and unless there are further questions, we are happy to rest on the briefs. Thank you. Thank you. I have one point on jurisdiction and I think five points with regard to the merits. On jurisdiction, simply point out that the Rosencrantz rule regarding an express repeal of a jurisdictional provision was never addressed by the United States in its brief and never addressed by our friends at Gilead in their brief either. With regard to the merits, I'll start bridging the two points. This 15-minute argument took 20 minutes probably by the time we're all done here is the only hearing we're ever going to get on this. The board never heard argument in this, and if the jurisdictional challenge that we have is rejected, then this is it for us. That's why we think we should get the 146 action, but it also really points out why the board went astray and didn't focus on the right thing here. My friends said you have to hunt through this huge patent disclosure. You don't have to. The heading of the left-hand column on one of our visual aids tells you it's headed General Synthesis of Two Prime C Branched Nucleosides. If that wouldn't direct an ordinary skilled artisan where to start reading, then nothing would. The second point is, Judge Newman, just to clarify from our earlier colloquy, there's no meaningful difference for purposes of this case between the 350 and the 600, the provisional and the actual patent. We included the entire patent in the record. That's the first two volumes, but only excerpts of the provisional. Third, the issue here is enablement, not written description. Enablement does not require working examples. That's what I've been hearing repeatedly from the other side. What is it that the specification taught that they didn't try? It taught the starting materials and it taught the routes of synthesis, and neither of those were the ones that Griffon, in his work, followed. And to that point, Judge Dyke, there's a lot of speculation going on about what Griffon did or did not know when he was doing his testing. Those were the routes that you're talking about, the ones followed by Clark? Yes. And if you look at the parallels between the Clark disclosure and our disclosure, you'll see that everything except the explicit disclosure of the fluorination step. Did you have testimony by somebody that if they tried this approach that you say was disclosed in the specification, they would have easily come to the synthesis? Well, not only did we put in testimony of that, but we even have from their own expert's mouth. Dr. Marquez at 39, 5, 23, and 24 said that you will get this particular compound if you apply the fluorination agent to it. The Clark patent, of course, shows the same thing. But out of the mouths of their own expert, they say that. It will happen. There's no experimentation to that one missing step. But I want to point out, Judge Dyke, on this point, they deposed Dr. Griffon. Didn't ask him about the specification. Didn't ask him if he had it. Didn't ask him if he followed it. Maybe, strategically, they followed the OTM rule of one too many questions because they didn't want to know the answer. But as the party with the burden, that's chargeable to them, and their strategic choices should not deprive us of the opportunity to have a proper finding. What about a finding by the board that the specification didn't teach how to do it? The finding of the board with regard to what the specification taught is that the specification did not specifically teach how to fluorinate a two-prime down tertiary fluorine. So that was not taught or suggested by the prior art. But it's undisputed on this record that fluorination agents, the DAST or deoxofluor that are disclosed here, are well known. They're within the ordinary skill of one in the art. And there's no finding that that would have required undue experimentation. Quite the contrary. The Marquez testimony that I just mentioned to you says that if you do that, which will be the natural thing that a person of ordinary skill would look to, you will get the targeted compound. And one final comment, Your Honor. With regard to the comment about maybe Dr. Griffin didn't have the specification, but he actually took the route in 2003 that we say should have been done, which is reacting the Matsuda compound 17 with DAST. Yes, he did do that. And he got six products. And he analyzed one of them. And you can't square that with their experts' own testimony that if you react Matsuda 17 with DAST, you will, not may, not might, not subject to a whole lot of things, you will get the targeted compound. Thank you, brothers. Thank you. We thank both sides and the cases submitted.